## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

VALERIE JOYCE SIMMONS,      :

     Plaintiff,             :

v.                       :      CA 16-00279-C

NANCY A. BERRYHILL,      :
Acting Commissioner of     :
Social Security,[1]         :

     Defendant.          :

## MEMORANDUM OPINION AND ORDER

Social Security Claimant/Plaintiff Valerie Joyce Simmons brought this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of a final decision of the Defendant Commissioner of Social Security (the "Commissioner") denying her applications for a period of disability ("PoD") and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.*, and supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.* The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Doc. 14 ("In accordance with the provisions of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties in this case consent to have a United States Magistrate

---

[1] Nancy A Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Berryhill is substituted for Carolyn W. Covin as the proper defendant in this case.

Judge conduct any and all proceedings in this case, including the trial, order the entry of a final judgment, and conduct all post-judgment proceedings.")).

Upon consideration of the briefs of the parties, (Docs. 16 & 19), the administrative record, (Docs. 11-13), (hereinafter cited as "(R. [page number(s) in lower-right corner of transcript])"), and the arguments presented during the hearing held on March 27, 2017, it is determined that the Commissioner's decision is due to be **AFFIRMED**.[2]

## I.     Background

Simmons was born on September 16, 1966, (R. 226 [SSA Ex. 1E]). The highest grade of school Simmons completed was the eleventh grade. (R. 231 [SSA Ex. 2E]). Simmons was employed as an insurance billing clerk, a home health aid, and a claims processor. (R. 231 [SSA Ex. 3E]).

Simmons filed applications for PoD and DIB with the Social Security Administration (the "SSA"),[3] on March 25, 2013. (R. 57). Simmons, also, filed an

---

[2] Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Doc. 26 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court.")).

[3] "The Social Security Act's general disability insurance benefits program ('DIB') provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. See 42 U.S.C. 423." *Sanders v. Astrue*, No 11-049-N, 2012 WL 4497733, at *3 (S.D. Ala. Sept. 28, 2012).

application for SSI on March 25, 2013.[4]   (R. 57).   In Simmons's applications, she

alleged disability beginning on August 15, 2012.[5]   (R. 57).   After Simmons's claim

was denied, she requested a hearing, which was held before an Administrative Law

Judge ("ALJ") for the SSA on June 16, 2014.   (R. 57).   On November 26, 2014, the

ALJ issued an unfavorable decision on Simmons's claims, finding her "not disabled"

under sections 216(i) and 223(d) of the Social Security Act.   (R. 54-75).

Simmons requested review of the ALJ's decision by the Appeals Council for

the SSA's Office of Disability Adjudication and Review.   (R. 24-27).   The Appeals

Council denied Simmons's request for review on April 18, 2016, which made the

ALJ's the final decision of the Commissioner.   (R. 1-7).   On September 30, 2016,

Simmons filed this action pursuant to § 405(g)[6] and § 1383(c)(3)[7] to review the final

---

[4] "The Social Security Act's Supplemental Security Income ('SSI') is a separate and distinct program.   SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. 1382(a), 1382c(a)(3)(A)-(C)."   *Sanders*, 2012 WL 4497733, at *3.

[5] "For SSI claims, a claimant becomes eligible in the first month where she is both disabled and has an SSI application on file.   20 C.F.R. § 416.202–03 (2005).   For DIB claims, a claimant is eligible for benefits where she demonstrates disability on or before the last date for which she [was] insured.   42 U.S.C. § 423(a)(1)(A) (2005)."   *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam).

[6] "Any individual, after any final decision of the Commissioner . . . made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner . . . may allow."   42 U.S.C. § 405(g).

[7] "The final determination of the Commissioner of Social Security after a hearing under

decision of the Commissioner.    (Doc. 1, at 1-2).

## II.    Standard of Review

"In Social Security appeals, [the Court] must determine whether the Commissioner's decision is supported by substantial evidence and based on proper legal standards.    Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citations and internal quotations omitted).    The Court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]."    *Id.* (citations omitted).    "Even if the evidence preponderates against the Commissioner's findings, [the Court] must affirm if the decision reached is supported by substantial evidence."    *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (citing *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); and *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).    "Yet, within this narrowly circumscribed role, [the Court does] not 'act as automatons.'"    *Bloodsworth*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citing *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981), *cert. denied*, 455 U.S. 912, 102 S. Ct. 1263, 71 L. Ed. 2d 452 (1982)).    The Court "must scrutinize the

paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. 1383(c)(3).

record as a whole, [*Ware*, 651 F.2d at 411]; *Lewis v. Weinberger*, 515 F.2d 584, 586-87 (5th Cir. 1975), to determine if the decision reached is reasonable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), and supported by substantial evidence, *Scharlow v. Schweiker*, 655 F.2d 645, 648 (5th Cir. 1981)." *Bloodsworth*, 703 F.2d at 1239.

"In contrast to the deferential review accorded to the [Commissioner's] findings of fact, the [Commissioner's] conclusions of law, including applicable review standards are not presumed valid." *Martin*, 894 F.2d at 1529 (citing *MacGregor*, 786 F.2d at 1053; *Smith v. Heckler*, 707 F.2d 1284, 1285 (11th Cir. 1983), *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982); *Smith v. Schweiker*, 646 F.2d 1075, 1076 (5th Cir. Unit A June 1981). "The [Commissioner's] failure to apply the correct legal standard or to provide the reviewing court with sufficient basis for a determination that proper legal principles have been followed mandates reversal." *Martin*, 894 F.2d at 1529 (citing *Gibson v. Heckler*, 779 F.2d 619, 622 (11th Cir. 1986); *Bowel v. Heckler*, 748 F.2d 629, 635-36 (11th Cir. 1984); *Smith*, 707 F.2d at 1285; *Wiggins*, 679 F.2d at 1389; *Ambers v. Heckler*, 736 F.2d 1467, 1470 (11th Cir. 1984)).

> The Social Security Regulations outline a five-step, sequential evaluation process used to determine whether a claimant is disabled: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of

Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178 (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Phillips v. Barnhart*, 357 F.3d 1232, at 1237-39 (11th Cir. 2004)).

## III.    Claims on Judicial Review

1.    "The ALJ Erred in Rejecting the Opinion of Dr. Ney, a Treating Psychiatrist."  (Doc. 16, at 2).

2.    "The ALJ Improperly Evaluated Ms. Simmons'[s] Complaints of Pain." (Doc. 16, at 2).

## IV.    Analysis

"At the first step, the ALJ must consider the claimant's current working situation.   If the claimant is 'doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.'"  *Phillips*, 357 F.3d at 1237   (alterations in original) (quoting 20 C.F.R. § 404.1520(a)(4)(i) & (b)).   "If however, the claimant is not currently 'doing gainful activity' then the ALJ moves on to the second step." *Phillips*, 357 F.3d at 1237.   At the first step, the ALJ determined Simmons had "not engaged in substantial gainful activity since August 15, 2012, the alleged onset date."  (R. 59).

At the second step, the ALJ is to "consider the medical severity of [the

claimant's] impairment(s)." 20 C.F.R. § 404.1520(a)(4)(ii). When considering the severity of the claimant's medical impairments, the ALJ must determine whether the impairments, alone or in combination, "significantly limit" the claimant's "physical or mental ability to do basic work skills." 20 C.F.R. § 404.1520(c). If the ALJ concludes that none of the claimant's impairments are medically severe, the ALJ is to conclude that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii) & (c). If, however, the ALJ concludes that the claimant's impairments are medically severe, then the ALJ moves on to the third step.

*Phillips*, 357 F.3d at 1237 (alterations in original). At Step Two, the ALJ

determined Simmons had the following severe impairments:

[M]ild to moderate degenerative osteoarthritis and degenerative disc disease of the cervical and lumbar spine, a history of sarcoidosis now in remission, fibromyalgia, and a mood disorder with mixed emotional features.

(R. 59).

At the third step, the ALJ again considers the "medical severity of [the claimant's] impairment(s)" in order to determine whether the claimant's impairment(s) "meets or equals" one of the listed disabilities. 20 C.F.R. § 404.1520(a)(4)(iii). Although the list is too voluminous to recite here, the idea is that the listings "streamline[ ] the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background." *Bowen v. Yuckert*, 482 U.S. 137, 153, 107 S. Ct. 2287, 2297, 96 L. Ed. 2d 119 (1987). If the ALJ concludes that the claimant's impairments meet or equal one of the listed disabilities and meet the duration requirement, the ALJ will conclude that the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii) & (d). If, however, the ALJ concludes that the claimant's impairments do not meet or equal the listed impairments, then the ALJ will move on to step four.

*Phillips*, 257 F.3d at 1238 (alterations in original). At Step Three, the ALJ found

that Simmons "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. (R. 60).

> At the fourth step, the ALJ must assess: (1) the claimant's [RFC]; and (2) the claimant's ability to return to her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). As for the claimant's RFC, the regulations define RFC as that which an individual is still able to do despite the limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a). Moreover, the ALJ will "assess and make a finding about [the claimant's RFC] based on all the relevant medical and other evidence" in the case. 20 C.F.R. § 404.1520(e). Furthermore, the RFC determination is used both to determine whether the claimant: (1) can return to her past relevant work under the fourth step; and (2) can adjust to other work under the fifth step . . . . 20 C.F.R. § 404.1520(e).
>
> If the claimant can return to her past relevant work, the ALJ will conclude that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv) & (f). If the claimant cannot return to her past relevant work, the ALJ moves on to step five.
>
> In determining whether [a claimant] can return to her past relevant work, the ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case. 20 C.F.R. § 404.1520(e). That is, the ALJ must determine if the claimant is limited to a particular work level. *See* 20 C.F.R. § 404.1567. Once the ALJ assesses the claimant's RFC and determines that the claimant cannot return to her prior relevant work, the ALJ moves on to the fifth, and final, step.

*Phillips*, 357 F.3d at 1238-39 (alterations in original) (footnote omitted). At the fourth step, the ALJ assessed that Simmons had the RFC:

> [T]o perform many elements of light level work as defined in 20 CFR 404.1567(b) and 416.967(b). However, she cannot perform a "full range" of such work as described in SSR 83-10. The claimant can sit for two hours at one time for a total of six hours over a standard 8-hour workday. She can stand for one hour up to three hours per standard workday; and she can walk for fifteen to thirty minutes at one given

8

time up to ninety minutes per day. She can stand and/or walk for at least four hours over an eight-hour day. She can never climb ladders, ropes, or scaffolds; never crawl; and just occasionally climb stairs or ramps. She can bend, crouch, kneel, or stoop no more than occasionally. She can never work at unprotected heights, around moving machinery, or with automotive equipment; occasionally push or pull with the arms; frequently reach or perform find manipulation, and occasionally reach overhead. She can never reach overhead to lift more than five pounds with the left upper extremity; and only occasionally push or pull with the left upper extremity. The claimant can remember assignments of simple routine repetitive tasks for two hours at a time. The claimant can occasionally make judgments or decisions when on the job. The claimant can occasionally handle changes in the workplace. The claimant can occasionally interact with the public or supervisors.

(R. 62). Based on this RFC, the ALJ determined Simmons is "unable to perform any past relevant work." (R. 67). At Step Five, the ALJ then determined there exist significant numbers of jobs in the national economy that Simmons can perform given her RFC, age, education, and work experience – specifically, router, electrical assembler, and document preparer. (R. 68). Thus, the ALJ found that Simmons was not disabled under the Social Security Act. (R. 69).

## A.    Claim 1

"'Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairments(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairments(s), and [the claimant's] physical or mental restrictions.'" *Winschel*, 631 F.3d at 1178-79

(alterations in original) (quoting 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).  "The law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citations omitted); *see also* 20 C.F.R. 404.1527(d)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.").  "'[G]ood cause' exists when the:  (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1240-41.  "When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons."  *Id.* at 1241.  "Where the ALJ articulate[s] specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error."  *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

> Moreover, the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987) (per curiam).  "In the absence of such a statement, it is impossible for a reviewing court to

determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). Therefore, when the ALJ fails to "state with at least some measure of clarity the grounds for his decision," we will decline to affirm "simply because some rationale might have supported the ALJ's conclusion." *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) (per curiam). In such a situation, "to say that [the ALJ's] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Cowart*, 662 F.2d at 735 (quoting *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979)) (internal quotation marks omitted).

*Winschel*, 631 F.3d at 1179 (alterations in original).

Simmons argues the ALJ reversibly erred when he did not assign controlling weight to the opinion of Simmons's treating physician, Kathryn Ney, M.D. (Doc. 16, at 2-7). Discharging the requirement that the ALJ "state with particularity the weight given to different medical opinions and the reasons therefore[,]" *Winschel*, 631 F.3d at 1179, he assigned no weight to the opinion of Dr. Ney, which was stated in a "Medical Source Statement-Mental" form dated May 19, 2014, ("MSS-M form"), (R. 552-54 [SSA Ex. 23F]), and the reasons therefor as follows:

> [T]he form in Exhibit 23F is completely inconsistent with the remainder of the evidence. Even Dr. Ney's treatment notes fail to support this extensive degree of limited functioning. Even when the claimant was not taking medications in Exhibit 16F, the claimant had good concentration and good hygiene. On the form in Exhibit 23F, Dr. Ney suggests that these areas are both markedly limited. This is directly inconsistent. When the claimant [took] her medications as prescribed, there were even fewer limitations/symptoms suggested.

(R. 67). Thus, the ALJ determined Dr. Ney's opinion was conclusory and not

bolstered by the evidence.

Simmons argues the ALJ failed to show good cause for rejecting the opinions of Dr. Ney. (Doc. 16, at 3). The reasons stated by the ALJ for assigning no weight to Dr. Ney's opinion are they were "completely inconsistent with the remainder of the evidence," "Dr. Ney's treatment notes fail to support this extensive degree of limited functioning" and "[e]ven when [Simmons] was not taking medications . . . the claimant had good concentration and good hygiene;" however, later during Simmons's treatment, Dr. Ney suggested her concentration and hygiene were both "markedly limited," which was "directly inconsistent," and "[w]hen [Simmons took] her medications as prescribed, there were even fewer limitations/symptoms suggested." (R. 67).

In the MSS-M form, Dr. Ney opined Simmons had a marked[8] impairment in regard to restriction of activities of daily living; degree of difficulty in maintain social functioning; deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely and appropriate manner; ability to understand, carry out, and remember instructions; ability to respond appropriately to supervision; ability to respond appropriately to co-workers; ability to perform simple tasks; and ability to

---

[8] "Marked" is used in the MSS-M form to describe "[a]n impairment which seriously affects ability to function independently, appropriately, effectively, and on a sustained basis; 'marked' is more than 'moderate,' but less than 'extreme.'" (R. 552 [SSA Ex. 23F]).

perform repetitive tasks; and Simmons had an extreme[9] impairment in regard to ability to respond appropriately to customary work pressures. (R. 552-53 [SSA Ex. 23F]). Dr. Ney opined Simmons would experience one or two episodes of decompensation in work or work-like settings, which would cause her to withdraw from that situation or to experience exacerbation of signs and symptoms. (R. 553 [SSA Ex. 23 F]). In addition, Dr. Ney opined Simmons's medications cause side effects, which impose some limitations but not to such a degree as to create serious problems in most instances, Simmons's impairments or treatment would cause her to be absent from work more than three days a month, and Simmons's prognosis was poor. (R. 552 & 554 [SSA Ex. 23F]).

The medical evidence shows Simmons first reported depression to Sudeep N. Rao, M.D., during an office visit on July 5, 2012, at which Simmons's chief complaint was neck pain, but an ancillary reason for her visit was depression associated with having to work in pain. (R. 318 [SSA Ex. 4F]). Later, on June 19, 2013, Edward M. Schnitzer, M.D., referred Simmons to a mental health specialist. (R. 382 [SSA Ex. 8F]). As a result, on July 23, 2013, Simmons reported to Dr. Ney, who Simmons saw for mental health treatment on July 23, 2013; August 21, 2013; November 19, 2013; February 14, 2014; May 15, 2014; and July 17, 2014. (R. 438-442 [SSA Ex.

---

[9] "Extreme" is used in the MSS-M form to describe "[s]evere impairment of ability to function independently, appropriately, effectively, and on a sustained basis.'" (R. 552 [SSA Ex. 23F]).

16F]; R. 555-56 [SSA Ex. 24F]; & R. 632 [SSA Ex. 32F]).

During Simmons's July 23, 2013, office visit, Dr. Ney completed an initial assessment of Simmons and noted as to Simmons:

> This is an attractively groomed woman in obvious pain. She relates well to the examiner. She is alert and oriented times four. Expressed thoughts are goal-oriented without evidence of psychosis. Mood is depressed and anxious and she states that her symptoms are anxiety, fear, pain, isolation, and irritability. She denies suicidal ideation. Cognitive functions, judgment, and insight are grossly intact.

(R. 442 [SSA Ex. 16F]). Dr. Ney's plan for Simmons was a "trial of amitriptyline to target depression, anxiety, sleep, and pain," which would "begin at 10 mg and advance by 10 mg every week aiming initially for a dosage of 40 mg." (R. 442 [SSA Ex. 16F]).

From Simmons's August 21, 2013, office visit, Dr. Ney noted Simmons had poor sleep, appetite, and energy; good grooming and hygiene; anxious and depressed mood; fluent speech; rational thought processing; normal thought content; good insight; good judgment; agitated psychomotor activity; full range of affect; no hallucinations; poor concentration; cooperative attitude; impaired memory; and she was alert and oriented to place, time, person, and situation. (R. 440 [SSA Ex. 16F]). Additionally, Dr. Ney noted Simmons worried about things she could not control and her depression and anxiety were rated at levels six (6) and eight (8), respectively. (R. 440 [SSA Ex. 16F]). Dr. Ney's plan for Simmons was to increase her amitriptyline dose and for Simmons to continue her stress and anxiety group. (R.

14

440 [SSA Ex. 16F]).

From Simmons's November 19, 2013, office visit, Dr. Ney noted Simmons had good sleep, appetite, and energy; good grooming and hygiene; elevated mood; fluent speech; rational thought processing; normal thought content; good insight; good judgment; normal psychomotor activity; full range of affect; no hallucinations; good concentration; cooperative attitude; intact memory; and she was alert and oriented to place, time, person, and situation. (R. 439 [SSA Ex. 16F]). Additionally, Dr. Ney noted Simmons's depression was not like it was, she worried less, the cold made her pain worse, and she walked one mile per day. (R. 439 [SSA Ex. 16F]).

From Simmons's February 14, 2014, office visit, Dr. Ney noted Simmons was "not too good," she had discontinued her medications, her unemployment benefits ceased, and she was involved in a car accident. (R. 438 [SSA Ex. 16F]; R. 556 [SSA Ex. 24F]). Dr. Ney noted Simmons anxiety rated between level five (5) and eight (8) and depression rated at level seven (7); good grooming and hygiene; anxious and depressed mood; fluent speech; rational thought processing; normal thought content; good insight; normal psychomotor activity; full range of affect; no hallucinations; good concentration; cooperative attitude; grossly intact memory; and she was alert and oriented to place, time, person, and situation. (R. 440 [SSA Ex. 16F]; R. 556 [SSA Ex. 24F]). Additionally, Dr. Ney noted Simmons's MDE (major depressive episode), GAD (generalized anxiety disorder), and chronic pain were under good

control until the car accident. (R. 438 [SSA Ex. 16F]; R. 556 [SSA Ex. 24F]). Dr. Ney's plan for Simmons was to add a trial of escitalopram. (R. 438 [SSA Ex. 16F]; R. 556 [SSA Ex. 24F]).

From Simmons's May 15, 2014, office visit, Dr. Ney noted Simmons had been really depressed, had high anxiety, was in and out of the hospital for colitis, had pain in her neck and stomach, was diagnosed with sarcoidosis type II, and stated she was "tired of being in pain." (R. 555 [SSA Ex. 24F]). Dr. Ney noted the escitalopram prescription "did[ not] do anything," but the amitriptyline helped with Simmons's sleep and depression. (R. 555 [SSA Ex. 24F]). Dr. Ney noted Simmons had good grooming and hygiene; elevated mood; fluent speech; rational thought processing; normal thought content; good insight; good judgment; agitated psychomotor activity; full range of affect; no hallucinations; poor concentration; cooperative attitude; grossly intact memory; and she was alert and oriented to place, time, person, and situation. (R. 555 [SSA Ex. 24F]). Dr. Ney's plan for Simmons was to add to Simmons's medications a trial of nortriptyline. (R. 555 [SSA Ex. 24F]).

From Simmons's July 17, 2014, office visit, Dr. Ney noted Simmons was still depressed, slept poorly, had poor energy, had gained weight, did not have motivation, felt isolated, and missed work and activities. (R. 632 [SSA Ex. 32F]). Dr. Ney noted Simmons had good grooming and hygiene; elevated mood; fluent speech; rational thought processing; normal thought content; normal psychomotor

activity; full range of affect; no hallucinations; distractible concentration; cooperative attitude; grossly intact memory; no loose associations; no obsessions/compulsion; no dissociative symptoms; and she was alert and oriented to place, time, person, and situation.  (R. 632 [SSA Ex. 32F]).  Dr. Ney's plan for Simmons was to taper and discontinue Simmons's prescription of nortriptyline and add a trial prescription of wellbutrin.  (R. 632 [SSA Ex. 32F]).

The levels of mental function limitations indicated by Dr. Ney are not supported by her clinical notes.  For instance, Dr. Ney opined in the MSS-M form Simmons had marked deficiencies in her activities of daily living, but her clinical notes indicate Simmons's grooming and hygiene were always good.  (R. 440 [SSA Ex. 16F]; R. 439 [SSA Ex. 16F]); R. 438 [SSA Ex. 16F]; R. 556 [SSA Ex. 24F]; R. 555 [SSA Ex. 24F]; & R. 632 [SSA Ex. 32 F]).  Dr. Ney opined Simmons had a marked degree of difficulty in maintaining social functioning, but her clinical notes indicate her speech, thought processing, thought content, insight, judgment, affect, and attitude were consistently fluent, rational, normal, good, good, full range, and cooperative, respectively.  (R. 440 [SSA Ex. 16F]; R. 439 [SSA Ex. 16F]); R. 438 [SSA Ex. 16F]; R. 556 [SSA Ex. 24F]; R. 555 [SSA Ex. 24F]; & R. 632 [SSA Ex. 32 F]).  Similarly, Dr. Ney's opinion Simmons's abilities on a sustained basis in a routine work setting to understand, carry out, and remember instructions; respond appropriately to supervision; respond appropriately to co-workers; respond

appropriately to customary work pressures; perform simple tasks; and perform repetitive tasks are not supported by Dr. Ney's clinical notes in regard to Simmons's speech, thought processing, thought content, insight, judgment, affect, and attitude. (R. 440 [SSA Ex. 16F]; R. 439 [SSA Ex. 16F]); R. 438 [SSA Ex. 16F]; R. 556 [SSA Ex. 24F]; R. 555 [SSA Ex. 24F]; & R. 632 [SSA Ex. 32 F]).   In addition, Dr. Ney noted Simmons's prescription of amitriptyline had a positive affect on Simmons's depression, sleep, and mental status indicators while Simmons's discontinuation of her medication had a notably negative affect on Simmons's mental status indicators. (*Compare* R. 439 [SSA Ex. 16F] & R. 555 [SSA Ex. 24F] *with* R. 438 [SSA Ex. 16F] & R. 556 [SSA Ex. 24F]).

Lastly, Dr. Ney's clinical notes are contradicted by other medical evidence in the record.   Within the period documented in Dr. Ney's clinical notes, on January 10, 2014, Tao Chen, M.D., noted Simmons had a normal mood and an appropriate affect, (R. 458 [SSA Ex. 18F]); on March 10, 2014, Dr. Chen, again, noted Simmons had a normal mood and an appropriate affect, (R. 453 [SSA Ex. 18F]); on May 8 2014, Marty McDonald, M.D., noted Simmons had a normal mood and affect, (R. 482 [SSA Ex. 21F]); on May 29, 2014, Dr. Chen noted Simmons had a normal mood and an appropriate affect, (R. 567 [SSA Ex. 26F]); and on June 26, 2014, Dr. Chen noted Simmons had a normal mood and an appropriate affect, (R. 576 [SSA Ex. 26F]).

For these reasons, the Court **OVERRULES** Simmons's assertion of reversible

error in Claim 1.

## B.    Claim 2

Under Social Security Ruling 96-7p:

The regulations describe a two-step process for evaluating symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness:

- First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms. If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

SSR 96-7p, *superseded by* SSR 17-2p.[10]   The ALJ found Simmons had severe medical impairments that included mild to moderate degenerative osteoarthritis and degenerative disc disease of the cervical and lumbar spine, a history of sarcoidosis now in remission, fibromyalgia, and a mood disorder with mixed emotional features, which   "medically determinable impairments could reasonably be expected to cause

---

[10]  Social Security Ruling 16-3p became effective on March 28, 2016.

only some of her alleged symptoms."   (R. 59 & 63).

> [O]nce an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms have been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.   For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.   This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individuals, and any other relevant evidence in the case record.   This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 C.F.R. 404.1529(c)(4) and 416.929(c)(4).   These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

SSR 96-7p.

The ALJ must not "reject [the claimant's] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [her] statements."   20 C.F.R. § 404.1529(c)(2).   The ALJ must consider other evidence, in addition to the objective medical evidence, because "symptoms sometimes suggest a greater severity of impairment than can be shown

by objective medical evidence alone." 20 C.F.R. § 404.1529(c)(3). Such evidence includes "any symptom-related function limitations and restrictions which [the claimant], [her] treating or non-treating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* Relevant factors of the effect of claimant's symptoms on her functional abilities include: her daily activities; the location, duration, frequency, and intensity of her pain or symptoms; any precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication taken by her to alleviate her pain or other symptoms; her treatment, other than medication, she receives or has received for relief of her pain or other symptoms; any measures she uses or has used to relieve her pain or other symptoms; and other factors concerning her functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

> If a claimant testifies as to his subjective complaints of disabling pain and other symptoms [. . .] the ALJ must clearly "articulate explicit and adequate reasons" for discrediting the claimant's allegations of completely disabling symptoms. *Foote* [*v. Chater*], 67 F.3d [1553,] 1561-62 [(11th Cir. 1995)]. "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court." [*Id.*] at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983)). The credibility determination does not need to cite "'particular phrases or formulations'" but it cannot merely be a broad rejection which is "'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical condition as a whole.'" *Foote*, 67 F.3d at 1561 (quoting *Jamison v. Bowen*, 813 F.2d 585, 588-90 (11th Cir. 1987)).

*Dyer v. Barnhart*, 395 F.3d 1206, 1210-11 (11th Cir. 2005).

Simmons argues the ALJ "rejected [her] statements concerning the intensity, persistence, and limiting effects of her symptoms," the ALJ's rejection of her statements was not "supported by substantial evidence," and the ALJ "failed to consider [other statements] that would have supported [her] allegations of pain and put her reported symptoms in context." (Doc. 16, at 7).

While the ALJ chronologically synopsized Simmons's medical evidence of record, he, also, articulated his reasons for discrediting her subjective complaints of pain based on those relevant factors for weighing the effects of her symptoms on her functional abilities. (*See* R. 63-65). As to Simmons's daily activities, the ALJ noted Simmons reported her "God baby stays with [her] from time to time," (R. 247 [SSA Ex. 5E]; R. 63); she performed her own personal care with some difficulty, except for her hair, (R. 248-49 [SSA Ex. 5E]; R. 63); she shopped online, (R. 250 [SSA Ex. 5E]; R. 63); and in November 2013, she reported she walked one mile per day, (R. 439 [SSA Ex. 16F]; R. 63), and Johnson Haynes, M.D., noted Simmons's exercise was normal and her ability to do activities of daily living was normal, (R. 408 [SSA Ex. 13F]; R. 63).

As to the location, duration, and frequency of Simmons's pain, the ALJ noted Simmons in June 2012 reported to Dr. Rao moderate pain along with some left arm pain, (R. 308 [SSA Ex. 3F], R. 63); in April 2013, she reported to Dr. Rao her pain

rated at six (6) out of a possible ten (10), (R. 365 [SSA Ex. 7F]; R. 64); on September 28, 2013, she reported to Seema Kapur, M.D., she had back pain for one week, (R. 395 [SSA Ex. 10F]; R. 64); on September 29, 2013, she reported back pain when she presented at USA Children's and Women's Hospital, (R. 400 [SSA Ex. 11F]; R. 64); on December 30, 2013, she presented at Greater Mobile Urgent Care with complaints of chest pain without mention of back or neck pain, (R. 429-30 [SSA Ex. 15F; R. 64); on March 10, 2014, she reported to Dr. Rao her pain was rated a three (3) and five (5) out of ten (10) with and without her medications, respectively, (R. 451 [SSA Ex. 18F]; R. 65); on April 23, 2014, she presented to Tangela C. Atkinson, M.D., who did not assess neck or back pain, (R. [SSA Ex. 19F]; R. 65); on August 6, 2014, she presented to Herbert Stone, M.D., without a complaint of neck or back pain, (R. 585 [SSA Ex. 28F]; R. 65); and on August 25, 2014, she presented to Jeffrey D. Faggard, M.D., with knee and neck pain, (R. 612 [SSA Ex. 30F]; R. 65).

As to the precipitating or aggravating factors of Simmons's pain, the ALJ noted she presented to David K. Donahoe, M.D., on April 25, 2013, and May 23 2013, who noted "pain with range of motion, no crepitance" and, also noted "range of motion full and painless."   (R. 366 & 369 [SSA Ex. 7F]; R. 64).

As to the type, dosage, effectiveness, and side effects of Simmons's medications, the ALJ noted Simmons, in June 2012, reported to Dr. Rao her treatment included only prescription NSAIDs, (R. 308 [SSA Ex. 3F]; R. 63), but she

reported on July 25, 20212, to Dr. Schnitzer she was prescribed Lortab, (R. 358 [SSA Ex. 6F]; R. 64); on July 25, 2012, Dr. Schnitzer prescribed her Percocet, (R. 358 [SSA Ex. 6F]; R. 63-64); on April 17, 2013, she reported to Dr. Schnitzer she tolerates her medications, and he noted her meds did not cause side effects and prescribed her Neurontin for her upper extremity pain, (R. 332 & 335 [SSA Ex. 6F]; R. 64); on May 23, 2013, Dr. Donahoe administered a trigger point injection into her left trapezius, (R. 370 [SSA Ex. 7F]; R. 64); on September 20, 2013, she presented to Bassam A. Bassam, M.D., who noted she took Flexeril for her neck spasms and Tylenol as needed for her headaches but did not note she took prescription narcotics, her Elavil dose was increased to 25 mg., and she was advised to take Tylenol as need for her headaches, (R. 390-91 [SSA Ex. 9F]; R. 64); on October 23 2013, she presented to Dr. Chen, who noted Percocet was not effective and prescribed her MsContin and MsIR without refills, (R. 414 & 416 [SSA Ex. 14F]; R. 64); on December 18, 2013, Dr. Chen administered to her a cervical epidural steroid injection, (R. 412-13 [SSA Ex. 14F]; R. 64); and on May 29, 2014, Dr. Chen noted Simmons was pleased with her medications, but he adjusted her medication due to a drug screen that showed she was positive for THC, (R. 566 & 568 [SSA Ex. 26F]; R. 65).

As to the other treatment for relief of Simmons's pain, the ALJ noted she presented to Dr. Schnitzer on July 2012, who noted she attended physical therapy for one month and it did not provide relief, (R. 358 [SSA Ex. 6F]; R. 64), and on

March 2014, she reported to Dr. Chen she attended physical therapy and it helped, (R. 451 [SSA Ex. 18F]; R. 65).

Therefore, the Court finds the ALJ properly assessed Simmons's credibility in regard to her complaints of pain and his credibility determination is supported by substantial evidence. For these reasons, the Court **OVERRULES** Simmons's assertion of reversible error in Claim 2.

## V.    Conclusion

In accordance with the foregoing analysis, it is **ORDERED** that the Commissioner's final decision issued April 18, 2016, denying Simmons's applications for PoD and DIB is **AFFIRMED** under 42 U.S.C. § 405(g) and 1383(c)(3).

Final judgment shall issue separately in accordance with this Order and Rule 58, Fed. R. Civ. P.

**DONE** and **ORDERED** this the 9th day of November 2017.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**